May it please the Court, Stephen Rosales for Plaintiff Appellant, Warren v. Burnham. In general, this case is about the paradigm with which the Social Security Administration considers medical opinion evidence and the hierarchy imposed with respect to the graduations with the weight assigned to different types of physicians that have seen or simply reviewed the medical evidence. More specifically, this case is about time in the sense that the statements that it rained on Monday but it did not rain on Tuesday on their face are inconsistent with each other because I am saying that it did rain and it did not rain. But simple logic tells us that they're not inconsistent because I'm talking about two different days, Monday and Tuesday. In this case, we have Warren v. Burnham filing for They sent him to psychiatric examiners who evaluated him once in August of 1998 and then again in January of 2000 and issued opinions. During this time, he was also seeing his treating physician. The ALJ denied the case initially which was appealed to the Commissioner's Appeals Council and the Commissioner's Appeals Council remanded to allow the ALJ to further consider the medical evidence in light of errors found with respect to the consideration of the treating physician. Upon this remand, in a decision that was issued in December of 2002, after a hearing where the ALJ took consideration of medical expert testimony, an expert that the administration itself asked and paid for to be there, the ALJ issued a decision again rejecting the treating testimony and issuing a decision finding him not disabled. The problem with that is that the treating physician offered a contemporary opinion in October of 2002 just before the ALJ issued a decision describing Mr. Burnham's condition. And so the issue before the district court is, when does a physician that examines an individual, especially in a psychiatric impairment and environment, become essentially stale? Here we have opinions that were offered in October. Is that it or is it a question of the weight and the credibility that the administrative law judge has to determine based upon the various opinions and records that are before him over the period of time that we're concerned with? The answer is, you're correct, Your Honor, that the ALJ has to consider the whole record. But the reality is... And as I understand it, the problem that the ALJ identified was that the opinion that you're talking about, the October 2002, isn't that the one where he just checked the forms, the boxes on the form, and the judge's concern was, where are the clinical findings in the record, the medical records that support the boxes? And then he considers the evaluations from others who have looked at your client, and he has to resolve, if you will, the credibility and decide which to believe. Isn't that what this case is all about? In general, Your Honor, you've summed up exactly what the ALJ is supposed to do. But the problem with that is, when we have cases, unfortunately, that last, as in this case, Mr. Burnham applied in 1998. And so when we have a case that bumps up and down administratively, gets denied, is appealed administratively within the administrative appeal process, is remanded with the delays in getting new hearings and decisions, several years have passed, we end up having an ALJ making a decision in December of 2002 based on evidence that was generated through a one-time examination only in August of 1998, or at best, in January of 2000. But our case law basically says, you know, we normally give the heaviest weight to the judge. But as I understand the record here, the problem is, there's just not much there in terms of the record by the treating physician that it would have helped the ALJ if the doctor had explained why, you know, what clinical findings supported checking the boxes. Well, I have to respectfully disagree, Your Honor, that that... That your case would have been improved if there had been... Well, first of all, I was an administrative counsel on this case. Okay. But Dr. Cho, or Dr. Chu, the treating physician, did submit, or the attorney submitted records on behalf of Mr. Burnham at the hearing, at the very first hearing, that detailed his condition with treatment notes, I believe, up through 2000, if not 2001. After denial, the appeals counsel remanded and the ALJ called a medical expert, which is often done to basically do what Your Honor has mentioned. We've got these one-time examiners, whether they, in my opinion, were remote in time, or at least if they are valid, and I would concede that if this decision had been made in 2000 or 2001, then the ALJ's analysis perhaps would have been correct. We have a 98 and a 2000 examination. We've got some treating records. ALJ looks at the record, resolves it. But we have something different here in the sense that the ALJ had a chance to do that, didn't do it properly, it was remanded, and then the ALJ called a medical expert, which ostensibly is called under the regulations to resolve the disparate opinions within the record. And Dr. Borden testified at the hearing, at administrative record pages 77 through 79, specifically on page 79, that initially her opinion was that for a brief amount of time, Mr. Burnham had an impairment that could be considered to be at even a marked level, but that was a very brief duration, but at the time of the hearing, and based on her review of the record, she agreed with Dr. Cho's opinion that he was at best moderate. Moderate. Correct. And then, and thankfully what the administrative counsel did do, I apologize, what the administrative law judge then did after receiving testimony from Mr. Burnham and the medical expert was ask a question of the vocational expert that was there to assume the limitations as described by Dr. Cho and confirmed by Dr. Borden, and the vocational expert said such a person with moderate limitations would not be able to maintain, would have significant difficulty in maintaining gainful employment. 30%, I think he said. Right, that was ALJ. 30% out or something, 30% away. Right, that was ALJ's question. What does that mean, that he's only 30% of normal or he's 70% of normal? What's the disability? I didn't quite get that. The commissioner uses terms of moderate with respect to mental impairments on a five-point scale. It goes none, slight, moderate, extreme, and severe. Some courts that I've found, and I can provide the citations because unfortunately I hadn't found them at the time I briefed this case, and I apologize for that, Your Honor, but some courts have said that if you take none as zero and severe as complete inability or 100%, they've simply went ahead and divided mathematically five points on a 100-point scale. So they've said... 20 points, five divisions. Right, exactly. So I've seen some courts say that moderate is equivalent to 20 to 30%. Some courts have found that moderate, since it's in the middle of a five-point scale, is equivalent to 50%. Fortunately, it's the ALJ's own use of the term moderate in this case, which he defined himself. Well, how does that get to be unemployable by the administrative experts or the guy? In Social Security ruling 96AP, it says that the... And in this court's case in Gatliff v. Atfeld, G-A-T-L-I-F-F, that the decision isn't whether or not someone can actually get a job. It's whether or not they can maintain and sustain gainful employment. And so with respect to a moderate impairment or an impairment that affects 30% of your ability to do something, the commissioner of 96AP says that when we talk about gainful employment, we mean 40 hours a week, eight hours a day, five days a week or equivalent, four 10-hour days, three 12-hour days. So when someone has a 30% inability on a particular limitation, in this case, I believe it was on the ability to maintain concentration and pace. Four or five of them. All right. So essentially, the reality is, if someone is falling short 30% of the day, if I'm supposed to make 100 widgets and every day I'm only getting 70 done, I might be able to get the job. But what the vocational expert's saying is, I'm not going to be able to keep it. Does that mean that he would then qualify for... In other words, if we were to say, Dr. Chu, I guess is the way you pronounce it, his opinion should have been validated. There was not sufficient evidence to discount it. His opinion should be validated. Does that mean that your client is then eligible for benefits? Well, at least from my point of view, yes, it would be. But the alternative remedy would be, and again, back to my issue of time, if the court agrees that someone who sees someone once in 1998 has no idea what's going on with them in 2002... You've made that point. ...then how can the ALJ rely on it? So then we would remand to allow the administration to get a more current picture before making a decision. This actually issue comes up a lot in these cases where I've gotten cases remanded from the district court. I've got an individual who saw someone in 2000. I'm back at a hearing in 2006, and I tell the judge, the last picture you have besides my treating doctor, which obviously is going to find him disabled because this is an opinion I submitted, is six years ago. We're more than happy to have you send him out to another doctor, your own doctor, to reevaluate him. To offer a more concurrent and contemporary opinion to the system. Is that what you want? Is that what you'd like us to do? Is to send it back and ask for an evaluation of your client's disability based on a current examination? That would be acceptable, Your Honor. How are we ever going to get finality in these cases if that becomes the standard disposition because of delays that are inherent in the appellate process? Your concern is one that this court has expressed as a frustration with many issues in the respect that it's not just social security cases, I can assure you of that. Well, let me tell you this. I'm 83. I'm not looking for finality. Correct. Neither am I, Your Honor. I'm only 35. Unfortunately, you would be surprised that the administration sometimes doesn't believe that it needs to do what a district court or even a Ninth Circuit Court of Appeals asked it to do on remand. And so, unfortunately, with this issue or any other issue, this court has many times recognized and published decisions that you see the same cases over and over because administration just doesn't learn. My point is if someone applies for benefits and you think it's important enough to get your own picture of what's going on with him and four years passes and they get another chance on administrative appeal for another hearing, wouldn't common sense say, well, four years has passed, why don't I send him out to a new examination and see what's going on with him today because now it's 2002? The problem I have with your argument, in a perfect world, I would agree with you that everything would be done in a very compressed fashion. But, you know, we've got principles of jurisprudence that say that we review the record that was before the administrative law judge. That's what we're reviewing on appeal. You're asking us, in essence, to expand or supplement the record based on what the situation is today. We also have a body of case law that says the burden is on the applicant seeking the benefits to show that he meets or equals the listings. And now you've raised an issue as to whether or not 30% is a disability. You know, I could see some employers saying if a person is 5% disabled, I don't want that person working because I don't want him unable to work 5% of the time. You're raising some issues here that I think are very problematic from a judicial and public policy perspective. With much respect, the consideration of the Step 3 issue is different than a consideration of a Step 5 issue. Just because something's not disabled at Step 3, just because the commissioner hasn't conceded at Step 3 that a 30% limitation is disabling, doesn't mean that once someone gets to Step 4 or Step 5 with vocational testimony, that, as in this case, it's clear it is disabled. But what do we do with the V.E. testimony that essentially says that there is sufficient residual functional capacity to do a number of these jobs in the economy? There isn't any testimony in this case, Your Honor, on a second decision at the second hearing. There was only one question asked. Because he never got that far. No, no, Your Honor. Dr. Borden, the medical expert, said, I agree with Dr. Chu. He's moderate. And then that testimony concluded and the ALJ turned to the vocational expert and said, assume moderate. Here's the way to define it. Can this person do the past work or any other work? Vocational expert, government's own witness, said, basically, no. Significant limitation. Not going to be able to do it. That's what we have in this case. Say that again. You talk kind of fast. I apologize. What's the last two sentences? Should we have the court reporter read them back? No. Vocational expert, in response to a question that assumed Dr. Chu's limitations, which were affirmed by the government's medical expert, said there would be no occupations available to this person. So my discussion with Judge Thompson was, ideally, you're correct. If we assume that the ALJ incorrectly, as of 2002, rejected not only Dr. Chu but their own medical expert's opinion, then benefits should be awarded in this case. Oh, I apologize. Alternatively, Dr. Pregerson, I mean, Judge Pregerson. That sounds pretty good. Judge, alternatively, Judge Pregerson, I would accept, on behalf of my client, the alternative remand that would allow the administration, if we don't accept Dr. Chu's opinions based on the concerns that Judge Tallman has mentioned with respect to we only have a short form that was filled out. Although my response is Dr. Borden went ahead and offered expert testimony that said that was enough for her. But my concern was with Judge Tallman's concern that Dr. Chu's opinion wasn't complete. And so I'm simply saying, as an alternative remedy, if this Court doesn't want to find, as it can, with respect to Dr. Chu's opinion that it should be credited and adopted, which with a vocational expert's testimony means benefits are granted, then we can remand this case, although it's not my preference, but we could remand this case, and I would go to a hearing and offer evidence and ask the judge to get a more recent medical opinion and decide the case that way. What you're saying is if you take Dr. Chu's opinion, if you take the opinion of one of the medical experts, and then you look at the opinion of the disability expert, that it's clear that your client has a moderate disability and no jobs available for him in the economy. Correct. What was the expert's name again? The medical expert was Dr. Borden, and the vocational expert was Mr. Goldfarb, I believe. Now, Borden was a Ph.D. Correct. She was a psychologist. The administration often uses psychologists for testimony, especially in the Pasadena office. Psychologists and or psychiatrists are considered acceptable medical sources. But just real quick, if I may, Judge Tolman. If the two CEs had been offered anywhere close to Dr. Chu's last opinion, even in 2001 or 2002, honestly, we wouldn't be here because the judge's analysis using more current opinions would have been enough to knock out, in my opinion, Dr. Chu's opinion, even Dr. Borden as a medical expert. But my concern is that this case had been remanded by the Appeals Council to allow the ALJ to more clearly consider the treating opinion. The ALJ called the medical expert. The medical expert offered an opinion that was consistent with that 2002 opinion, and yet the ALJ simply glossed over it. And my point is, I understand your frustration with the sort of up-and-down nature, but at the end of the day, what Mr. Burnham is entitled to is having ALJ do what he's supposed to do, which is make a good decision based on, in my opinion, current medical evidence. And so my ultimate concern, too, was with ALJ on page 13 of the administrative transcript in his decision, where he said that his opinion was consistent with respect to the functional limitations with Dr. Borden's testimony. And if you read that paragraph, that's the only paragraph he talks about Dr. Borden's testimony, and he believes it's consistent. But when you read that paragraph on page 13 of the transcript and read what Dr. Borden had to say on pages 77 through 79, you see that the ALJ isn't consistent with Dr. Borden. And that's another problem, because ALJ gets this case back, calls Dr. Borden. Dr. Borden doesn't say anything that he actually wants her to say, and then he just simply either ignores it or writes a decision, it's consistent, and I like opinions from four years ago. That's all. Okay. Well, let's hear from the government. I apologize, and I thank you for the extra time. No, thank you. That's all right. Good morning, Your Honors. My name is Jaime Preciado, and I represent the Commissioner of Social Security Administration. This case really centers around the ALJ's resolution of conflicting medical evidence and the substantial evidence the ALJ relied upon in drawing his conclusions. The ALJ is charged with resolving inconsistencies in the medical evidence, and that's exactly what he did here. As the district court found, the ALJ relied partially on the August 31, 1998, consultative psychiatric evaluation of Dr. Lawrence Ogbeche. Now, because Dr. Ogbeche's report was based on independent clinical findings, it constituted substantial evidence. Dr. Ogbeche, after a mental status examination, found no evidence of psychotic disorders or delusional disorders in the claimant. He diagnosed substance-induced mood disorders based on past marijuana and cocaine usage. He found the claimant had no restrictions in daily activities, no difficulty in maintaining social functioning, and he was capable of understanding, remembering, and carrying out simple commands. The ALJ also relied on the January 3, 2000, consultative psychiatric evaluation of Dr. Barry Edelman. Dr. Edelman diagnosed depressive disorder, a history of polysubstance abuse, and chronic depressed mood hallucinations in the face of marijuana and alcohol abuse. Dr. Edelman and ALJ noted that claimant could understand, remember, and follow complex instructions, maintain concentration and pace at work, and interact sufficiently with peers and supervisors. But he also noted that claimant would have difficulty interacting with the public on a consistent basis because of his downcast effect. The doctor also noted that claimant left work in March of 19- He said he was downcast. I mean, he was depressed all the time. His sad effect, downcast effect. Yeah. Did the vocational expert say there was any kind of work that this fellow could do? Yes, he did. The vocational expert, Your Honor, said there were several jobs that the claimant could do, including mail clerk, deliverer, garment bagger. Mail clerk? Yes, Your Honor. Post office? Well, a general mail clerk dealing with mail, not dealing with the general public. The jobs that the vocational expert- Maybe a clerk in the post office? A mail clerk. There would be numerous jobs not dealing with the general public in unskilled work at the light exertional level that the claimant- He's talking about the post office. Not necessarily the post office, but a general mail clerk position dealing with mail or deliveries, or delivery of mail. Like in a law firm where the person delivers the- Exactly like a clerk in the mail office or any type of business or corporation, not dealing with the general public. Dr. Edelman also noted that when claimant left work in March of 94, he was abusing alcohol and marijuana at the time, and he went into outpatient care in 1996. Now, the assertion of stale evidence by the claimant is just the claimant's effort to reweigh the substantial evidence that the ALJ relied upon in this case. The ALJ did reject Dr. Chu, who did find moderate limitations in several areas, but the ALJ did note that Dr. Chu based his evaluation on a checkbox form, which does not constitute substantial evidence and can be given minimum evidentiary weight. Well, but Dr. Chu was the treating doctor, wasn't he? Yes, he was, but because he used a checkbox form, checkbox forms are not supported by objective medical evidence. Therefore, they can be given minimum evidentiary weight even as a treating physician. So the ALJ did properly reject Dr. Chu's opinion as having minimum evidentiary weight because they used this checkbox form without the supporting mental status examination or some objective evidence to support those functional limitations that the treating physician opined. You know, I was just looking at the ER pages 80 and 81, maybe 79 to 81, where the vocational expert is testifying, and I was trying to get a date of that. Well, there were two vocational experts who testified. At the first hearing, the ALJ, the vocational expert testified on pages 59 through 60, and that's Dr. Goldfarb. And that's the first hearing. It was May 18, 2001. I'm sorry, Your Honor. Then on, I guess it's November 6, 2002. Is that right? Now, when this vocational expert testifies, they ask him, you know, they put the hypothetical to him at the bottom of 79 and go all through this stuff. And they said, now, assuming all of this, he said, could that person perform any of the past relevant work? No. And then bottom of 80, well, could he, could you identify any other work a person could perform? I guess he means like that. And the expert says, well, you know, I consider moderate limitations significant. And he says there's a 30 percent. He says there's work no matter how simple. A lot of people can't do it, no matter what the work is. Now, that doesn't say that he can do this work as a clerk or all of that. The work that he could do came from the earlier, what, 2000 testimony? It was 2001, Your Honor. 2001 testimony. But the more current, I guess then they have the rehearing after that. Is that right? That's correct, Your Honor. And at the rehearing, the vocational expert can't come up with any work this guy can do. Is that right? That is correct, Your Honor. But the hypothetical that was posed was based on moderate limitations of Dr. Chu, which the ALJ properly rejected because they were based on checkbox forms and not based on objective medical evidence. So the ALJ did correctly give Dr. Chu's moderate limitations minimum evidentiary weight. And he did pose that hypothetical to the VE, but he ultimately concluded that there were no moderate limitations that claimant had. He relied on the consultative opinions of Dr. Edelman. I see. And Dr. Obechey. So there was ALJ went back, and because he did not find these moderate limitations, he went back and relied on the first vocational expert at the first hearing in 2001. Do you agree with your colleague that if we were to credit Dr. Chu's reports, then this applicant would qualify for benefits? No, I don't agree with that, Your Honor. Even if we say, well, we accept everything Dr. Chu said with these moderate limitations, still that's not enough to entitle him to benefits. Why not? Well, the second vocational expert said that you're correct, that the past relevant work claimant could not do. But what he said was that the claimant would have difficulty doing other work in the national economy. He did not dispositively say claimant could not do any work in the national economy. He said there would be a 30 percent reduction, but that leaves 70 percent that is still open to interpretation. That's what I'm wondering. If you have a fellow that can do 70 percent of the job, is he employable? Well, if there's a 70 percent opening, if a person can do, let's say, 70 percent, there would have to be a determination made as to whether or not there are other jobs in the national economy that this claimant could do. Because he only said that claimant would have difficulty performing. He did not say claimant could not perform any work in significant numbers in the national economy. So the commissioner's position would be that substantial evidence supports the ALJ's decision in this case, based on the CE opinions and the rejection of Dr. Hsu because he used this checkbox form, which was not based on objective evidence. But assuming arguendo, that Dr. Hsu's moderate limitations are applicable, there would have to be testimony on whether or not claimant could perform other work in the national economy because it's not clear. What would the applicant do? Would he call Dr. Hsu and say, Dr. Hsu, you made this check as to moderate impairment on your form. Why did you do that? What did you base that on? And then Dr. Hsu would testify? Is that the way you do that? Well, the consultative examiners in this case, they perform mental status examinations, which are based on objective findings by the consultative examiners. So if Dr. Hsu would have had objective findings such as a mental status examination, then the ALJ would have had a harder time rejecting or would have had to reject Dr. Hsu's opinion for other reasons if he was going to reject it. But because it was only a checkbox form and there was no objective findings supporting the checkbox form, it was properly rejected. How do we know whether Dr. Hsu did or did not look at this other evidence that apparently was in the file? How do we know that? Other medical evidence? You just told me there were these other records, but there was no indication he looked at them. Exactly. We don't know how Dr. Hsu drew his conclusions. He is a treating physician, but there should be some objective findings. And there, of course, is case law saying that the use of checkbox forms in arriving at a conclusion can be given minimum evidentiary weight, even for a treating physician. So if Dr. Hsu had actually prepared reports or had other things in his file at the time he filled out the checkbox form, they didn't make it into the record? We don't know whether they exist or not. Correct, Your Honor. All we have is the form from Dr. Hsu. Correct. And what reasons did the ALJ give for rejecting Dr. Hsu's opinion? The checkbox? Well, the main reason he gave is it wasn't supported by any objective evidence. The district court agreed with the ALJ's analysis in, again, finding that there was no objective evidence that Dr. Hsu referred to in utilizing the checkbox form. So that was the primary reason that the ALJ gave for the rejection of Dr. Hsu and the use of the consultative examiner's substantial evidence to support his opinion as to claimant's residual functional capacity. Which said the opposite, right? Yes. Would Dr. Hsu's report indicate that he had these other reports in his file? I think that was actually the problem, is that there was no reference back to other objective reports by Dr. Hsu. Well, have these reports been transmitted to him? Could they have been? No, did he have them? I mean, were they sent to him? Well, Dr. Hsu was from, I believe, the Arcadia Mental Health Center. And there are records from the Arcadia Mental Health Center, including some of Dr. Hsu's records. But his ultimate conclusions on functional limitations, there was no evidence referred to as far as, like I said, for example, a mental status examination which goes through kind of this objective finding by the examiner that can be relied on in determining functional limitations. Well, but all those records were available to him at the hospital. Yes, and the records from the Arcadia Mental Health Center are in the record in this case. And that is where Dr. Hsu, I believe that's where he was. Is it reasonable to assume that he would have examined those records, read them? Well, if he did, then I think the main issue is whether or not he referred to objective findings. And he did not. He only used the checkbox form. And that was the issue the district court had and the ALJ had, is if Dr. Hsu did have objective records and some type of objective findings, he should have referred to those in the functional limitations on the checkbox form. He did not. Therefore, the ALJ properly rejected that checkbox form as not being supported by objective evidence. Further, the ALJ had the consultative exams, which are themselves substantial evidence. The ALJ decision is really based on reasonableness. Was it reasonable for the ALJ to rely on the consultative? Who hired these consultants? The government did, Your Honor. The government did, yeah. Okay, so the ALJ had no duty to inquire as to whether there were other records in the hospital where Dr. Hsu was treating this gentleman? Well, the – He says, oh, well, there's just a check, you know. Well, you see that where the doctors use those checkboxes. Well, the ALJ did review records from the Arcadia Mental Health Center where Dr. Hsu was employed, and those records basically demonstrated an improvement on the part of the claimant. The CEs essentially found that the impairments were brought on by a substance abuse type of disorder from prior drug usage. But there are other records from the Arcadia Mental Health Center the ALJ did review, the treating records, and noted in his opinion. Let me just – let me take a look here. For example, in September of 2000, it was noted that plaintiff was not motivated to return to work because he was awaiting his SSI appeal, and that was from the Arcadia Mental Health Center. Yeah, well, if he's depressed, he's not going to be motivated to go to work. I think that the notes from the Arcadia Mental Health Center, they are on the record, and they were reviewed by the ALJ. In January of 2001, the ALJ noted that claimant was – the Arcadia Mental Health Center noted claimant was doing better, and that he stated that he quit his last job in 1994 due to harassment, not due to any functional limitations or disability. So the records from the Arcadia Mental Health Center were reviewed by the ALJ and considered, along with Dr. Chu's opinion in the checkbox form that he used. Let me make sure I understand what you're saying. Is your answer to Judge Pregerson's question that to the extent that there were records from the Arcadia Mental Health Center, including Dr. Chu's treatment records, those are in the record, that they were all in the Arcadia Mental Health Center file? Correct. And as far as we know, there are no missing records from Dr. Chu. We got the Arcadia file. That's correct, Your Honor. And in the Arcadia file was Dr. Chu's checkbox form, among other things. That's correct. Also, the ALJ's duty to develop the record only comes into play when the record is ambiguous or it's inadequate, and the ALJ made no such finding here that the record was ambiguous or inadequate. He had Dr. Chu's opinion, which he properly rejected. He had the CE's opinion, which he accepted and relied upon, forming his residual functional capacity. To sum up, the ALJ gave specific legitimate reasons for rejecting the treating opinion of Dr. Chu and basing his residual functional capacity on the findings of Dr. Edelman and Dr. Ogbechi. The ALJ, again, properly rejected Dr. Chu's opinion as not being based on objective medical evidence. And he rejected Dr. Chu's update in October of 2002 because that also was a checkbox form that did not change, in a way, his opinion from 2001. No new functional limitations were found by Dr. Chu. And, again, it was based on a checkbox form, this updated 2002 opinion. You didn't check the same boxes as you had before? Correct, correct. The only thing he noted, Dr. Chu noted, was that claimant had an excellent response to treatment and was responding well to medication. So it seems from that, and if you look at the longitudinal history, claimant was improving as time went on. The ALJ, therefore, properly concluded that plaintiff retained the residual functional capacity for light work with limited public contact based on the CE opinions. Thank you. We'll give you a few minutes for rebuttal. Very briefly, Administrator Record, page 424, may answer a few of your questions, Judge Pregerson, with respect to Dr. Chu's opinion. While he did complete the checkbox form, this page essentially is entitled Treatment Summary, and he documents that he's treated Mr. Burnham from March of 99 through October 30th, 2002, which was the day before he filled out that form. Common sense would indicate that most likely he put down he's seen him on October 30th as part of a mental status evaluation. He does note, as the Defendant's Counsel indicated, that his response to treatment had been excellent, but as Dr. Borden described, and as we concede, at some time in the late 90s he was at the marked level, and now it's at moderate. But just because you respond excellently to treatment doesn't mean you've gotten all better, as Dr. Chu on this page indicated that he had a global assessment functioning of 45, which is, when looked into the medical text, indicates an inability to maintain work or any type of meaningful employment. So essentially I think the records in the file from Dr. Chu from Arcadia Mental Health, the multiple forms that he's filled out on this page indicate that he's offered an objective opinion based on evaluation. And again, the defendant, the rappellee, focuses on the substantial evidence test. But before you can get to the test, you've got to figure out what substantial evidence is. And if you look at the case I cited from the Third Circuit, where be where, the Court has said that an opinion offered, especially in a psychiatric field or a psychological field, two or three or four years before you make a decision isn't substantial evidence, especially when it comes from a one-time examining physician. But the problem I'm having with your argument, Counsel, is that the doctors are basically saying, Mr. Burnham does fine as long as he's clean and sober, and he is clean and sober in 2001 and 2002. Why isn't that substantial evidence to support the ALJ's determination that he is no longer disabled? He might have been disabled earlier when he was on drugs and alcohol, but he's not now. The reason for that, my response to that, Your Honor, is looking at the ALJ's decision. The two CEs then taken after Hull would say that he has no psychological impairment, and that's not what the judge found. Well, they're saying he's responding, you know, even Dr. Chu's response to treatment is excellent. Basically that the care that he's getting is working. Right. Why doesn't that... To a moderate degree. Well, but... So we have a difference in opinion. I mean, you're re-arguing the evidence. Well, what I'm saying is obviously we have a difference. My opinion is that if someone sees someone once in 1998, that opinion isn't applicable to 2002. And I don't think any doctor would ever say that, because you don't know what's happened in four years. So when Dr. O... I call it Ogibichi, but when Dr. Ogibichi issued his opinion in 98, or the later CE in Edelman in 2000, what does that have to do with 2002? Because the judge has to make a decision whether he was disabled in 98, 99, 2000, and all the way up to the day of the decision. Well, but aren't you overlooking the medical expert's testimony at the hearing, which is later? No, I'm not overlooking it, because it agreed with Dr. Chu. You're saying that he didn't give it enough weight. Right. And she agreed with Dr. Chu. So my point is, in 2002, when he made his decision, I'll stand here and say, I'll agree that, as I said before, in 98, 99, and 2000, the judge had enough to deny the case. But as of 2002, contemporary evidence shows us that there was only one piece of evidence from Dr. Chu, and there was only testimony from a medical expert that supported Dr. Chu. So when he decided whether or not he was disabled in 2002, there was only two bits of evidence. And both those bits, according to the vocational expert, would make it difficult to work. And so that's my point, is what I'm trying to say, is that ALJ has a responsibility to make a decision back in 98, for 98, 99. And he has a remedy. He could simply say, based on the evidence, I don't believe he was disabled, you know, 98, 99, 2000, 2001. I either should, as we've talked about here, the duty of the fooling fairy of the belt, I just got this case back on remand, I should send him out to get him more updated. Because if I'm going into a hearing, and I'm an ALJ, and all I got is a treatment evidence that says that he's got a moderate impairment, and then I get testimony that says he's got a moderate impairment, and then a VA tells me that he ain't going to be able to work, if I want to deny the case, I'll send him out to my own doctor to see what they have to say first. But he didn't do that. All he wanted to do was say, well, I got 1998 here, and I have got 2000, so I'll just take those two guys two and a half, four years ago, slap them on today, and say goodbye to Dr. Chu and Dr. Borden. And that's what I'm saying is not right. That's my point. And that goes back to your frustration that you have to sit here and clean up the mess. And my point is, is you're going to keep on seeing me, because until this court, although it's done it a lot of times, turns that ship around that is the administration, that's what's going to happen. And, you know, unfortunately. When it went back to the administrative law judge, I thought I heard earlier that he sent your client out for another expert examination. No, no. I said that's what I tell judges when I get these cases back. They should do. Yeah. That's what I tell them. Because I don't want to stand before you if I went to a hearing and Judge Palmer looked at me and said,  I looked at this transcript, Mr. Rosales, and I didn't see you ask the judge for a new examination. Not let alone that it's the judge's burden, perhaps, to get it himself, but I think on any case that is remanded either by the appeals council or by the district court or even this court, or God forbid the Supreme Court, and it's been several years since the last administration examination, and all I've got, if I'm a judge, is the treatment doctor records, which usually in most cases are going to support the finding of disability. If I'm a good judge, I'm going to say, I better get my own evidence, because it's been six years or four years since they've seen our doctors. Was there any evidence here that his counsel at that time asked for another evaluation? Unfortunately, it doesn't appear so, Your Honor. Many social security attorneys don't do appellate work, and occasionally they might go to the appeals council. This attorney that's on this record, as well as many other attorneys, as I'm sure since you've seen many of us from our firm here, send their work to us to sort of help clean up the mess. To clean up the mess. Right. And they're not sensitive to things like waiver and that sort of thing. And believe me, while I enjoy coming to visit you all, I'd much rather handle these cases at the hearing or some other lower level, but unfortunately, that's where I'm at. Again, thank you for the phone call. When it went back to the administrative law judge, there was no new evidence that was presented. Other than Dr. Chu and the testimony of the medical expert, Dr. Borden. Just those two. Correct. And that was my point. If you're going to deny a case, yes, Judge Tallman's right. You can use a 1998 opinion or a 2000 opinion, in my opinion, under the Weir case to deny the case during that relative time period and perhaps a reasonable amount of time after someone's seen a one-time examiner. But once you get into a multi-year lag between an examination and a fresh opinion, you've got nothing else to deny the case on. That's my point, is not whether or not he properly applied the test. If he's awarded benefits, though, the benefits are retroactive, are they not, to the date of the disability? Well, at the time of this hearing, December 2000, the judge could have issued what's called a partially favorable decision, denying the case for a certain period. No, I understand what the judge can do, but as a matter of law, he could, if he wins full relief, get benefits clear back to the date of his original application for benefits. Under this application for supplementary income, yes. So we can't totally reject. I mean, the judge could find that he's only going to give him benefits starting in 2001, if you want. Correct. Yeah, that could be a result. And to tell you honestly, I've had judges on remand tell me I got the court appeal, I looked at the evidence, I'm comfortable with January 1, 2001, based on Dr. Ju's opinion and because we got old stuff and I want to get it done. And I'd say, honestly, because I don't want to come back and see Judge Dahlman. We'll take it. Exactly. Okay. Thank you, Your Honor. All right. Thank you, counsel. Mr. Rosales, I just noticed that the degrees of impairment that are in the mental assessment form, there are only four separate, not six. There's not five. There's none, slightly limited, moderately limited, and markedly limited. That's an ER-425. Right. That was a form that administrative counsel sent to Dr. Chu. It's not the administration's graduation. It's similar to it. When I reference the five-point scale, that's what's actually in the regulations. Oh. The regulations state that when evaluating mental impairments, ALJs will find that a mental impairment limits someone either none, slight, moderate, marked, or extreme. Oh, they just omitted extreme, I guess. Exactly. Okay. Whose form is this, by the way, this mental assessment form? I'm sorry? Who made up this form? Let's just check the boxes. There's several different forms like that. Your Honor, I can only imagine it's some type of resource. Okay. Attorneys can purchase how to prosecute social security cases, and there's back, you know, forms that help develop the evidence because, essentially, treating doctors are concerned about helping someone get better. They're not worried about issuing an opinion that addresses the medical and vocational issues. Okay. I didn't mean to take that. Right. Thank you, Your Honor. Thank you. Thank you. We appreciate it. Good arguments on both sides.
judges: Pregerson, Thompson, Tallman